Robert C. Schubert S.B.N. 62684
Willem F. Jonckheer S.B.N. 178748
Amber L. Schubert S.B.N. 278696
Sonum Dixit S.B.N. 353395
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel.: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law
sdixit@sjk.law

Christian Levis (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
Rachel Kesten (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com

Alec M. Leslie (*pro hac vice*)
**BURSOR & FISHER, P.A.**
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7126
E-Mail: aleslie@bursor.com

Joshua R. Wilner (State Bar No. 353949)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: jwilner@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

IN RE EDWARD D. JONES & CO. DATA PRIVACY LITIGATION

Case No. 3:26-cv-01178-JD

**CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Theresa Stevens, Dennis Frasher, and Vishal Shah bring this Class Action Complaint ("Complaint") on behalf of themselves, and all others similarly situated (the "Class Members") against Edward D. Jones & Co., L.P. and The Jones Financial Companies, L.L.L.P. (collectively, "Edward Jones"), which operate, control, and manage at least the domains "https://www.edwardjones.com/" and "https://onlineaccess.edwardjones.com" (collectively, the "Edward Jones Properties"). The allegations contained in this Complaint, which are based on Plaintiffs' knowledge of facts pertaining to themselves and counsel's investigations, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this class action lawsuit on behalf of similarly situated individuals to address Edward Jones's unauthorized disclosure of its customers' and prospective customers' Private Information, including personally identifiable information ("PII") such as IP address and identifiable cookies, and personal financial records, to unauthorized third parties, including, at least, Google LLC ("Google"), Meta Platforms, Inc. ("Meta"), The Trade Desk, Inc. ("The Trade Desk"), LinkedIn Corporation ("LinkedIn"), and Contentsquare Israel Ltd. ("ClickTale").

2. Edward Jones owns, operates, and controls the Edward Jones Properties, which can be used for: (1) opening brokerage accounts; (2) obtaining financial advisory services; (3) accessing investment research and educational resources; (4) logging into the customer portal and mobile app; and (5) viewing account statements, portfolio holdings, and transaction history.

3. Edward Jones knowingly and intentionally designed the Edward Jones Properties to require communications of private data from its customers and prospective customers when they used Edward Jones Properties, including when they searched for a financial advisor at Edward Jones and used the Edward Jones customer portal to initiate a financial relationship, or view account statements, portfolio holdings, and transaction history.

4. The unauthorized tracking via the Edward Jones Properties occurred and continues to occur because of the Tracking Technologies Edward Jones installed on the Edward Jones Properties that customers and/or prospective customers interact with, including but not limited to Google Analytics, Google Tag Manager, Google Ads, Google DoubleClick, the Meta Pixel, the LinkedIn Insight Tag, the

Adsrvr Pixel (used by The Trade Desk), and ClickTale Session Replay (collectively, "Tracking Technologies").[1]

5. The Tracking Technologies Edward Jones installed and configured on the Edward Jones Properties disclose and allow unauthorized third parties to intercept the contents of customers' and prospective customers' communications, receive and view customers' and prospective customers' Private Information, and use it for their own purposes, including in connection with their respective advertising businesses, to improve their own technologies and to track and enrich the profiles they maintain about individuals like Edward Jones's customers.

6. Plaintiffs and other Class Members who used the Edward Jones Properties reasonably believed they were communicating only with Edward Jones given the sensitive nature of their information and the fact that much of this communication occurred behind a password-protected portal. Nothing about the Edward Jones Properties indicated that unauthorized third parties would be intercepting and/or recording, capturing, or obtaining Private Information, communications, and PII submitted by customers and prospective customers.

7. Unbeknownst to Plaintiffs and Class Members, however, the Edward Jones Properties contained Tracking Technologies within their source code that surreptitiously intercepted, recorded, and transmitted Plaintiffs' and Class Members' private online activity and communications, including within private password-protected portals, to third parties without their consent, in violation of numerous laws, industry standards, and user expectations.

8. For example, Edward Jones disclosed, and allowed Google to intercept and/or record, each customer's full transaction history, the value of their accounts, and the last four digits of their account number(s), alongside their IP address(es) and identifiable cookies that tie that information back to a specific person within Google's systems and other advertising and profiling systems operated by data brokers and/or advertising companies, like The Trade Desk.

---

[1] This Complaint demonstrates various Tracking Technologies were still used on the Edward Jones Properties as of the filing of this Complaint, but given the full extent of Edward Jones's use of Tracking Technology over time is within its exclusive knowledge and control, Plaintiffs cannot allege every tracking and/or marketing tool that was installed on the Edward Jones Properties during the relevant period. These additional facts will be revealed during discovery.

9. The Tracking Technologies Edward Jones incorporated into the Edward Jones Properties are not limited to the customer portal. The same Tracking Technologies are present on all pages of the Edward Jones websites, including the pages to find a financial advisor, research Edward Jones's investment services, and take a survey to match with financial advisors. This data is aggregated together against unique identifiers associated with each individual customer or prospective customer to enhance the Tracking Technology providers' ability to follow and profile them as they use the Edward Jones Properties and others across the internet.

10. By installing Tracking Technologies on the Edward Jones Properties, Edward Jones effectively installed a listening device in Plaintiffs' and Class Members' web browsers, apps, and devices that disclosed and caused their communications to be intercepted, accessed, viewed, recorded, and captured by third parties in real time, as they were communicated to Edward Jones. This wiretapping is no different than if Edward Jones had allowed the same third parties to access telephone wires in their offices so that the third parties' engineers could secretly listen to and record conversations between people and their brokers revealing the intimate details of their financial lives.

11. The information Edward Jones divulged to unauthorized third parties is particularly sensitive, given that it contains personal financial records, including password-protected account balances and transaction details, which prospective and current customers expected to remain private. Worse, this information was not anonymized or deidentified—as reflected by the disclosure of identifiable PII, such as IP addresses, alongside the financial record information—nor were the third parties prohibited from using this information for their own benefit. Indeed, many of these unauthorized third parties used this information for their own purposes, including to construct profiles of individuals, and train machine learning models, AI systems, or other algorithms, that power their entire targeted advertising and content delivery infrastructure.

12. Consequently, Plaintiffs bring this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin Edward Jones from making similar disclosures of its prospective and current customers' PII and financial records in the future, to require destruction of the information it has already disclosed, and to fully articulate, inter alia, the specific

information it discloses to third parties and the identity of all recipients of that information along with their uses.

13. As a result of Edward Jones's conduct, Plaintiffs and Class Members have suffered numerous injuries, including invasion of privacy, loss of benefit of the bargain, diminution of value of the private and financial information, statutory damages, and the continued and ongoing risk to their private information.

14. Plaintiffs seek to remedy these harms and bring causes of action for (1) violation of the Electronic Communications Privacy Act ("ECPA"); (2) violation of California Invasion of Privacy Act ("CIPA") § 631; (3) violation of CIPA § 632; (4) violation of CIPA §§ 638.50 & 638.51; (5) common law invasion of privacy (intrusion upon seclusion); (6) invasion of privacy in violation of the California Constitution, Article I, Section 1; (7) violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (8) violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502; (9) negligence; and (10) unjust enrichment.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because: (1) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (2) there are more than 100 putative members of the Class; and (3) a significant portion of the Class are citizens of a different State than Edward Jones.

16. This Court has jurisdiction over Edward Jones because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State, including the interception, use, and storage of Plaintiffs' and other California customers' PII and other private data. Edward Jones engages in these activities for profit.

17. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

18. This Court has personal jurisdiction over Edward Jones because Edward Jones has sufficient minimum contacts within this District. Venue is proper in this District because a substantial part

of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

19. Edward Jones is a broker-dealer registered in California since 1971.[2] As of January 2025, it has 802 branches in California,[3] and has branches in at least 73 cities within this District.

20. Edward Jones incorporated Tracking Technologies provided by California entities in this District, including Meta, Google, and LinkedIn, on Edward Jones Properties.

21. Edward Jones allowed these California entities to intercept Plaintiffs' and the Class's private data.

22. Plaintiffs—and all members of the California subclass—were in California at the time of this interception.

23. Each of these California entities used this data for their own purposes from their headquarters in the State of California. Edward Jones also worked with these entities in California to obtain analytics and advertising services based on the data intercepted by and disclosed to these California entities. Thus, the storage, use, and monetization of Plaintiffs' and the Class's private data occurred in California.

24. Pursuant to Civil L.R. 3-2(c), the assignment to the division is proper because a substantial part of the conduct which gives rise to Plaintiffs' claims occurred in this division.

## THE PARTIES

25. **Plaintiff Theresa Stevens** resides in San Diego County in the State of California.

26. Plaintiff Stevens has accounts with Google and Facebook.

27. Plaintiff Stevens has been a customer of Edward Jones since approximately 2005. As an Edward Jones customer, Plaintiff Stevens paid fees to Edward Jones in exchange for financial services.

28. Plaintiff Stevens frequently visits the website available at https://www.edwardjones.com/, including the Edward Jones portal available at https://onlineaccess.edwardjones.com, which requires her to log in with her User ID and password. This includes reviewing her transactions and account balances.

29. Plaintiff Stevens visited Edward Jones Properties while physically present within the state

[2] *California Joins Multi-State $17 Million Settlement with Broker-Dealer Edward D. Jones*, DFPI, https://dfpi.ca.gov/press_release/california-joins-multi-state-17-million-settlement-with-broker-dealer-edward-d-jones/ (last visited Jun. 18, 2026).

[3] *Id.*

of California.

30. Unbeknownst to Plaintiff Stevens, while she was communicating with Edward Jones on the Edward Jones Properties in the State of California, Edward Jones disclosed to and allowed her private and identifiable communications to be intercepted and recorded by third parties, including, at least, Google, Meta, The Trade Desk, LinkedIn, and ClickTale. This includes disclosing Plaintiff Stevens's full transaction history to Google. The full list of data Edward Jones disclosed is described further in Section IV.

31. The information Edward Jones disclosed contains "nonpublic personal information" ("NPI") as defined by the GLBA, the California Financial Information Privacy Act ("CFIPA"), and the Insurance Information and Privacy Protection Act ("IIPPA"), as codified by Cal. Insurance Code §§ 791-791.27.

32. Plaintiff Stevens did not consent to the disclosure, interception, and/or recording of her private communications on the Edward Jones Properties.

33. **Plaintiff Dennis Frasher** resides in San Benito County in the State of California.

34. Plaintiff Frasher has accounts with Google and Facebook.

35. Plaintiff Frasher has been a customer of Edward Jones since approximately 2013. As an Edward Jones customer, Plaintiff Frasher paid fees to Edward Jones in exchange for financial services.

36. Plaintiff Frasher frequently visits the website available at https://www.edwardjones.com/, including the Edward Jones portal available at https://onlineaccess.edwardjones.com, which requires him to log in with his User ID and password. This includes reviewing his transactions and account balances.

37. Plaintiff Frasher visited Edward Jones Properties while physically present within the state of California.

38. Unbeknownst to Plaintiff Frasher, while he was communicating with Edward Jones on the Edward Jones Properties in the State of California, Edward Jones disclosed to and allowed his private and identifiable communications to be intercepted and recorded by third parties, including, at least, Google, Meta, The Trade Desk, LinkedIn, and ClickTale. This includes disclosing Plaintiff Frasher's full transaction history to Google. The full list of data Edward Jones disclosed is described further in Section IV.

39. The information Edward Jones disclosed contains NPI as defined by the GLBA, the CFIPA, and the IIPPA.

40. Plaintiff Frasher did not consent to the disclosure, interception, and/or recording of his private communications on the Edward Jones Properties.

41. **Plaintiff Vishal Shah** resides in Orange County in the State of California.

42. Plaintiff Shah has an account with LinkedIn.

43. In or around October 2025, Plaintiff Shah sought to be matched to a financial advisor on the website available at https://www.edwardjones.com/. By answering the questions in the associated quiz available on this web property, Plaintiff provided information related to his financial condition, private investments, employment status, and other elements of his private affairs.

44. Plaintiff Shah visited https://www.edwardjones.com/ and completed this quiz while physically present within the state of California.

45. Plaintiff Shah visited https://www.edwardjones.com/ using the same device and browser used to access his LinkedIn account. When creating his LinkedIn account, Plaintiff provided certain information to LinkedIn, including his full name.

46. Unbeknownst to Plaintiff Shah, while he was communicating with Edward Jones on the Edward Jones Properties in the State of California, Edward Jones disclosed to and allowed his private and identifiable communications to be intercepted and recorded by third parties, including, at least, Google, Meta, The Trade Desk, LinkedIn, and ClickTale. This includes disclosing Plaintiff Shah's PII and answers to survey questions. The full list of data Edward Jones disclosed is described further in Section IV.

47. The information Edward Jones disclosed contains NPI as defined by the GLBA, the CFIPA, and the IIPPA.

48. Plaintiff Shah did not consent to the disclosure, interception, and/or recording of his private communications on the Edward Jones Properties.

49. **Edward D. Jones & Co., L.P. (d/b/a Edward Jones)** is a limited partnership headquartered in Missouri and a broker-dealer subsidiary of The Jones Financial Companies, L.L.L.P. Edward Jones operates the Edward Jones Properties, which allow prospective and current customers to communicate with Edward Jones, for services including opening accounts, finding financial advisors,

viewing transaction histories, and initiating relationships with financial advisors.

50. Edward Jones knowingly and intentionally incorporated Tracking Technologies on the Edward Jones Properties including for the purposes of disclosing its customers' and prospective customers' private communications to third parties, such as Google, Meta, LinkedIn, The Trade Desk, and ClickTale, so that it could use the analytics and advertising services offered by these third parties to serve targeted advertisements both to them (e.g., to generate more investments) and others like them (e.g., known as "lookalikes" who are prospective customers) and, consequently, make more money.

51. As the owner and operator of the Edward Jones Properties, Edward Jones had control over the technology it incorporated, and whether it used third parties' Tracking Technologies.

52. Edward Jones knew at the time it incorporated Tracking Technologies on the Edward Jones Properties that the disclosure and recording of users' private communications to third parties would occur by virtue of the Tracking Technologies' purpose, how they function, and the analytics and advertising services Edward Jones received as a result.

53. For instance, Google provides web property and app operators that use its Tracking Technology (like Edward Jones) with access to the data collected from their users and provides them with tools and analytics to leverage that information, including through Google Ads, to reach not only those specific individuals but others like them whom Google identifies based on its vast internal array of profiling data collected from both Google owned and operated web properties (e.g., Google Maps, YouTube, Google.com) and others that incorporate Google's Tracking Technology. Edward Jones knew, from these analytics and ads data, that it was allowing identifiable personal and financial information about individuals to be intercepted and recorded through these technologies it incorporated on the Edward Jones Properties.

54. Despite this, Edward Jones intentionally continued to disclose its users' private communications through its incorporation of these types of Tracking Technologies on the Edward Jones Properties, despite the privacy harm it caused Class Members.

55. **The Jones Financial Companies, L.L.L.P.** is a limited liability limited partnership headquartered in St. Louis, Missouri. The Jones Financial Companies is the parent company and sole owner of Edward D. Jones & Co., L.P.

56. As the parent company of Edward D. Jones & Co., L.P., The Jones Financial Companies, L.L.L.P. exercises control over its subsidiary's operations, policies, and business practices, including decisions regarding the technology deployed on the Edward Jones Properties.

## FACTUAL ALLEGATIONS

### I. The Gramm-Leach-Bliley Act and California Financial Information Privacy Act

57. As Congress and the California Legislature recognized, "nonpublic personal information" is confidential.

58. Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i) Personally identifiable financial information; and

(ii) Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

59. Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i) A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii) About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii) [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

(A) Information a consumer provides to [a financial institution] on an application to obtain a loan, credit card, or other financial product or service;

(B) Account balance information, payment history, overdraft history, and credit or debit card purchase information;

(C) The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

(D) Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

(E) Any information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; [and]

(F) Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server)[.]

60. Pursuant to 16 C.F.R. § 313.3(k)(1):

> A financial institution "means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C. 1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution."

61. Pursuant to 16 C.F.R. § 313.3(k)(1), Edward Jones is a financial institution.

62. In passing CFIPA, the California Legislature "intend[ed] for financial institutions to provide their consumers notice and meaningful choice about how consumers' NPI is shared or sold by their financial institutions[]" and "intend[ed] . . . to afford persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act[.]" Cal. Fin. Code § 4051(a)-(b).

63. Cal. Fin. Code § 4052(a) provides that:

> "Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution.

64. According to Cal. Fin. Code § 4052(b):

> "Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:

(1) Information a consumer provides to a financial institution on an application to obtain a loan, credit card, or other financial product or service.

(2) Account balance information, payment history, overdraft history, and credit or debit card purchase information.

(3) The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(4) Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(5) Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

(6) Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

65. "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

66. Plaintiffs' and Class Members' NPI is confidential, under both federal and California law. As described below, by disclosing and allowing third parties to intercept Plaintiffs' and Class Members' NPI, Edward Jones flouts the GLBA's and CFIPA's respective purposes of enhancing "financial privacy" and violates objective expectations of privacy.[4]

## II. The Edward Jones Properties

67. Founded in 1922, Edward Jones is one of the largest investment firms in North America and primarily serves individual investors through a network of financial advisors. Edward Jones operates tens of thousands of branches located throughout the United States and Canada. Hundreds of the branches are located throughout California.

68. Edward Jones services approximately 8 million customers with investment accounts, managing hundreds of billions of dollars in customer assets. The firm has consistently grown over the years, with a focus on everyday individuals instead of the ultra-wealthy.

69. Edward Jones markets itself as providing long-term investment strategies for everyday investors, offering retirement planning, investment portfolio management, education savings plans, estate

[4] *See* Cal. Fin. Code § 4051.5.

planning guidance, and insurance products. Its approach emphasizes building lasting relationships with customers through its neighborhood-based advisors.

70. Edward Jones operates and manages multiple web properties as part of this business, including the website available at https://www.edwardjones.com/ and the customer portal available at https://onlineaccess.edwardjones.com/, to, among other things, allow prospective customers to learn more about the types of services Edward Jones offers, find a financial advisor, open a brokerage account, and view their transaction history.

71. All Edward Jones customers have access to a password-protected portal accessible at least through https://onlineaccess.edwardjones.com. The portal can only be accessed by customers with an account who sign in, which requires using the User ID and password. Plaintiffs and Class Members reasonably expected the information on this password-protected portal to remain private and for any communications to only occur between themselves and Edward Jones.

72. Unbeknownst to prospective, current, and past customers, Edward Jones secretly embedded a host of Tracking Technologies on the Edward Jones Properties, including within this password-protected portal, providing for the disclosure, interception and/or recording, and subsequent use of their private PII and sensitive financial information.

### III. The Tracking Technologies at Issue

73. Edward Jones incorporated Tracking Technologies from various third parties, typically in the form of snippets of code embedded in Edward Jones Properties that surreptitiously intercept users' actions, including private communications. These third parties include at least, Google, Meta, The Trade Desk, LinkedIn, and ClickTale—entities that operate some of the largest advertising platforms in the world and who use the intercepted information for their own commercial purposes, including to augment the profiles they maintain about individuals, and improve their technology for targeting individuals with ads both on properties they own and operate (e.g., Google.com, Google Maps, YouTube, Facebook, Instagram) and other web properties that participate in their respective ad networks.

74. These companies also offer server-side integrations or direct upload channels, such as Meta's Conversions API, that allow operators of web properties with Tracking Technology, like Edward Jones, to directly provide customer information, including PII and other identifiers and information, to

further identify these people for tracking and ads optimization. This data is also used by the Tracking Technology providers in their own systems, for example to augment user profiles, track individuals on other web properties, or improve ad targeting capabilities.

**A. Google Ads and Google Analytics**

75. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $3 trillion. The core driver of this value is digital advertising.

76. Google "make[s] money" from its "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[5] Indeed in 2023, Google generated $237.8 billion in advertising revenue alone, which amounted to more than 77 percent of Google's total revenues for the year.

77. Google offers various Tracking Technologies, including Google Analytics and Google Ads, which exist solely to help drive ad revenue. For instance, Google's analytics products integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google Analytics, Google Chrome, and Google's Android operating system also improve the company's advertising network and capabilities by providing a direct pipeline to Google of data that it uses to enrich the vast amount of interconnected data it maintains about them.

78. Google Analytics is deployed by dropping a small piece of Google-engineered code on a given web property or app. This code immediately intercepts a user's interaction with the web property or app every time the user visits or uses it, including what pages they visit, what they click on, and what they input into text fields.

79. The code also collects multiple pieces of identifiable information so that Google can connect that data within its systems to a specific individual. This includes multiple cookie values Google creates for this precise purpose, along with device information, such as unique ad identifiers and settings used to create a digital "fingerprint" for people, IP addresses that tie them to specific locations (like their homes), and more. This does not require a person to have a Google account, to be signed into their Google

---

[5] Alphabet Inc. SEC Form 10-K for fiscal year ended December 31, 2020, https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

account, or even use a Google product. Google has a special set of cookies and systems created specifically to track and identify individuals not signed into a Google product at the time they use a website, or who attempt to use private browsing mode.[6] According to Google's own employees, this is how it "connect[s] the dots" to "associate[]" and store the data with the host of other information Google has about individuals in its own logs.

80. Google provides web property owners with analytics about their sites and apps based on this data, including reports on acquisition (e.g., information about where the customer's traffic originates, the methods by which users arrive at the customer's site or app, and the marketing efforts the customer uses to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that users visit), and demographics (e.g., classify the web property owner's users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities). However, the main purpose of Google's Tracking Technologies, including Google Analytics, is to promote targeted ads both on Google.com (so called "search ads" or "Google ads") or other Google owned and operated products (e.g., YouTube), and across Google's display network (Google "display ads") which includes thousands, if not millions, of web properties.

81. In addition to providing customers with ads services, Google also uses the data collected through Google Analytics and other Tracking Technologies for its own purposes, including to improve its ad targeting capabilities, machine learning and AI models, products and services, and data collections on users.

82. Customers like Edward Jones can also send data to Google through a server-to-server connection or through a third-party intermediary. Similarly, Google can forward data it receives to other third parties on behalf of Edward Jones. This allows customers like Edward Jones to further disguise what data it sends to third parties because no one (other than these parties) can observe what data is sent server-side.

[6] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 n.11 (N.D. Cal. 2023).

83. Transmissions from users' browsers through Google's Tracking Technology occur in the same manner on each web property where the technology is loaded. When an action is taken on a website, the individual's browser sends a request to Edward Jones's server requesting that server to load the particular webpage. Google's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. The Tracking Technology, installed by Edward Jones, causes the browser to secretly and contemporaneously duplicate the communication with a website, transmitting it to Google's servers alongside additional information that transcribes the communication's content and the individual's identity. This transmission is initiated by Google's code and concurrent with the communications with the host website.

**B. Meta's Business Tools and the Pixel**

84. Meta operates the world's largest social media company and generated $164 billion in revenue in 2024, almost all of which comes from advertising. Meta's advertising business has been extremely successful due, in large part, to Meta's ability to use data recorded by its Tracking Technologies to target people at a granular level.

85. In conjunction with its advertising business, Meta encourages and promotes entities and web property owners, such as Edward Jones, to utilize its "Business Tools" to gather information about people, identify, target, and market products and services to them.

86. One such Business Tool is Meta Pixel. Upon its release in 2015, Meta touted Meta Pixel as a new way to gain insights about how people use websites. The "pixel" itself is a small snippet of website code written by Meta engineers. To use the Meta Pixel, an advertiser places a pixel (i.e., a code snippet) into the code of their website.

87. The Meta Pixel is designed by Meta to "track[] the people and type of actions they take" across all pages accessible on a web property (e.g., such as all pages accessible under the Edward Jones Properties) with a single code snippet.[7] When a user accesses a webpage on a web property using the Pixel, their communications with *every* webpage are instantaneously and surreptitiously intercepted and

[7] *Retargeting*, META, https://www.facebook.com/business/goals/retargeting (last visited Jan. 14, 2025).

recorded by Meta's code and sent to Meta's servers.

88. Through this technology, Meta intercepts information about each page a user visits, what buttons they click, as well as specific words they type into form boxes (e.g., when searching for an advisor, or applying for an account) on the web property. Meta also receives "events" data reflecting data fields identified by the web property owner, which can reveal even more information about the individual and their specific interactions or communications.

89. The information Meta receives via the Meta Pixel includes identifying information sufficient to identify a particular individual either directly (e.g., by name or email) or in combination with other information, like unique device identifiers, cookie values, IP addresses, already in Meta's possession (e.g., either because it was collected from another web property using its Tracking Technology or the individuals' use of a Meta owned and operated app or property). For instance, Meta uses "[a]dvanced" matching techniques to link the data received via the Meta Pixel to Facebook users[8] and also analyzes information entered in online forms to uncover further PII about the user, such as their email address, to identify each individual.[9]

90. Meta stores the data captured by its Tracking Technologies on its own servers for its own commercial purposes. Meta then provides the web property owner whose property this information is recorded from with access to analytics generated from the data recorded (e.g., which users took certain actions on any given webpage, how many, etc.). This is accessed through the web property owner's Facebook Ads Manager account, as well as potentially through the Facebook Events Manager.[10] The data available to the web property owner is a limited set and does not include all information Meta has about the individuals whose communications and actions it recorded through its Tracking Technology.

91. In this way the Meta Pixel has two purposes: (1) it enriches Meta's ability to collect data about individuals across the web, and enriches its profiles about them, and (2) facilitates web property

---

[8] *Getting Started*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Feb. 4, 2026).

[9] *About Advanced Matching for Web*, Meta, https://www.facebook.com/business/help/611774685654668?id=1205376682832142 (last visited Feb. 4, 2026).

[10] *Conversion Tracking*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited Feb. 4, 2026).

owners spending money on Meta ads. For instance, Meta encourages website owners to create "custom audiences" of users who have taken the same or similar actions on the website based on the data received through the Meta Pixel to target them directly with ads. Meta also uses this audience to "identify other Facebook users" similar to them (i.e., "lookalikes") and to "target [those similar users] with [the website owner's] ads."[11] Meta uses the full complement of data in its possession—not just that received from the web property—to identify these individual targets.

92. Meta also uses the data it receives through the Meta Pixel to fuel its own advertising business. Meta's documentation confirms that Meta feeds the data received through the Meta Pixel into "machine learning models" that "consider that person's behavior" to predict who is likely to respond to any given ad, making its advertising services even more lucrative.[12] These machine learning models "learn[]" more about individuals as they "receive[] new data." Thus, each person whose data Meta receives through the Meta Pixel directly contributes to how successful Meta is at targeted advertising and contributes to Meta's ad revenue.

93. In true 'move fast and break things' spirit, Meta built these systems to sell ads without incorporating any way to limit or prohibit the use of data collected through Meta Pixel. According to leaked internal Meta documents, Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'" Thus, any data the Meta Pixel intercepted from Edward Jones Properties was incorporated into Meta's ads systems and models, and benefited its business.

94. Meta's customers, like Edward Jones, can also send data to Meta through a server-to-server connection or through a third-party intermediary (e.g., sending data to data platforms like AppsFlyer or mParticle which then route traffic to Meta and others). This allows customers like Edward Jones to disguise what data it sends to Meta because no one (other than Meta) can observe what data Edward Jones

---

[11] *Id.*

[12] *Good Questions, Real Answers: How Does Facebook Use Machine Learning to Deliver Ads?*, Meta, https://www.facebook.com/business/news/good-questions-real-answers-how-does-facebook-use-machine-learning-to-deliver-ads (last visited Feb. 4, 2026).

uploads directly to Meta for use in ads, or sends through third parties. Which data Edward Jones uploaded to Meta directly or sent through third parties and how that data is used, accordingly, will be uncovered during discovery.

95. Transmissions from users' browsers through the Meta Pixel occur in the same manner on each website where the technology is loaded. When an action is taken on a website, the user's browser sends a GET request to Edward Jones's server requesting that server to load the particular webpage. Meta's embedded code, written in JavaScript, sends secret instructions back to the user's browser, without alerting the user that this is happening. The Pixel, installed by Edward Jones, causes the browser to secretly and contemporaneously duplicate the communication with a website transmitting it to Meta's servers, alongside additional information that transcribes the communication's content and the individual's identity. This transmission is initiated by Meta's code and concurrent with the communications with the host website.

**C. The Trade Desk**

96. The Trade Desk, Inc. is a publicly traded technology company operating one of the largest demand-side platforms for programmatic advertising, generating over $2 billion in annual revenue.[13] The Trade Desk enables advertisers to purchase ad placements across thousands of websites, apps, and connected TV platforms through real-time bidding auctions.

97. Central to The Trade Desk's business is its identity resolution technology, which links user activity across multiple devices, browsers, and platforms to create unified user profiles.[14] The Trade Desk deploys its "Universal Pixel" tracking code, which is coded by the moniker "Adsrvr" on websites like the Edward Jones Properties to collect data about user behavior and match it to persistent identifiers.[15]

98. When a user visits a website with The Trade Desk's tracking code, the technology captures

---

[13] *The Trade Desk Reports Fourth Quarter and Fiscal Year 2024 Financial Results*, THETRADEDESK INVESTOR RELATIONS, https://investors.thetradedesk.com/news-and-events/news/news-details/2025/The-Trade-Desk-Reports-Fourth-Quarter-and-Fiscal-Year-2024-Financial-Results/default.aspx (last visited Feb. 4, 2026).

[14] *See how our identity solutions help advertisers do more*, THETRADEDESK, https://www.thetradedesk.com/our-demand-side-platform/identity-solutions (last visited Feb. 4, 2026).

[15] *The Trade Desk Universal Pixel*, Tealium, https://tealium.com/integrations/the-trade-desk-universal-pixel/ (last visited Feb. 4, 2026).

information including page URLs, user actions, IP addresses, email addresses, device identifiers, and cookie values.[16] The Trade Desk then connects this data across different contexts—matching, for instance, a user's laptop browsing to their mobile phone activity to their connected TV viewing.

99. This identity resolution enables The Trade Desk to build comprehensive profiles of individuals' online behavior.[17] The Trade Desk maintains that these profiles allow advertisers to specifically identify individuals across multiple devices and platforms, facilitating persistent tracking and targeted advertising.

100. Web property owners like Edward Jones can integrate The Trade Desk's Tracking Technology through direct implementation or server-to-server connections, making the data transmission invisible to users.

101. Transmissions from users' browsers through the Adsrvr Pixel occur in the same manner on each website where the technology is loaded. When an action is taken on a website, the individual's browser sends a request to Edward Jones's server requesting that server to load the particular webpage. The Trade Desk's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. The Pixel, installed by Edward Jones, causes the browser to secretly and contemporaneously duplicate the communication with a website transmitting it to The Trade Desk's servers, alongside additional information that transcribes the communication's content and the individual's identity. This transmission is initiated by The Trade Desk's code and concurrent with the communications with the host website.

**D. LinkedIn**

102. LinkedIn Corporation, a wholly-owned subsidiary of Microsoft Corporation, operates the world's largest professional networking platform with over 900 million members. LinkedIn generates substantial revenue through its advertising business, which relies heavily on tracking user behavior across the web to enable professional audience targeting.

103. LinkedIn provides the "LinkedIn Insight Tag," a piece of tracking code that website owners

---

[16] *How identity graphs are built — the present and the future*, THETRADEDESK (March 6, 2024) https://www.thetradedesk.com/resources/how-identity-graphs-are-built-the-present-and-the-future (last visited Jun. 17, 2026).

[17] *Id.*

can embed in their properties to collect data about visitors.[18] When installed on websites like the Edward Jones Properties, the Insight Tag intercepts information about user visits, actions taken, and pages viewed.

104. The Insight Tag captures identifying information including cookie values, device identifiers, IP addresses, and page URLs. LinkedIn uses this data to match website visitors to LinkedIn member profiles, enabling advertisers to target individuals.[19]

105. Through this technology, LinkedIn can identify when one of its users visits the Edward Jones Properties and record their activity, even if the user is not actively using LinkedIn or logged into their LinkedIn account at the time. LinkedIn's tracking persists across browsing sessions through cookies and other persistent identifiers.

106. Like other Tracking Technologies, LinkedIn's Insight Tag can be implemented through server-to-server connections, making the data transmission invisible to individuals.

107. When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

108. These cookies also include data that differentiates users from one another and can be used to link the data collected to the user's LinkedIn profile.

109. The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies. Each of these cookies is used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[20]

110. For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[21] Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[22]

---

[18] *LinkedIn Insight Tag*, LINKEDIN HELP, https://www.linkedin.com/help/lms/answer/a489169 (last visited Feb. 4, 2026).

[19] *Get started with LinkedIn website retargeting*, LINKEDIN HELP, https://www.linkedin.com/help/linkedin/answer/a420433 (last visited Feb. 4, 2026).

[20] *LinkedIn Cookie Table*, LINKEDIN, https://www.linkedin.com/legal/l/cookie-table (last visited Jun. 17, 2026).

[21] *See id.*

[22] *See id.*

111. A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based on information it obtains through the LinkedIn Insight Tag, LinkedIn targets its account holders for advertising.

112. LinkedIn uses the data obtained from third-party websites, like Edward Jones Properties, for its own purposes, including to improve its ad measurement capabilities and ability to target individuals across their various devices.

113. Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects or receives.

**E. ClickTale**

114. Contentsquare Israel Ltd. (d/b/a ClickTale) is an Israeli corporation that provides session replay and user analytics technology. Unlike traditional analytics that capture discrete data points, ClickTale's technology records complete user sessions, enabling website operators to replay users' entire interactions as if watching a video recording.

115. ClickTale functions by embedding tracking code into a website that captures all user interactions in real time, including mouse movements, clicks, scrolling behavior, keystrokes, and all content visible on users' screens.[23] This creates a comprehensive record of everything users see and do during their sessions.

116. When deployed on the Edward Jones Properties, ClickTale's code continuously monitors and records user activity, transmitting this data to ClickTale's servers. The session recordings capture not only which pages users visit, but also the specific content displayed on those pages, including account balances, transaction details, personal information, and any other data visible during the session.

117. This technology is particularly invasive because it captures information that users may view but never intended to submit or share. For instance, if a user views their account balance or transaction history, ClickTale records this information even though the user took no action to transmit it to third parties.

---

[23] *What are session recordings (or replays) and how to use them*, CONTENTSQUARE, https://contentsquare.com/guides/session-recordings/ (last visited Feb. 4, 2026).

118. Web property owners like Edward Jones can access these recordings through ClickTale's platform to analyze user behavior.

119. ClickTale uses the data it collects not only to provide analytics to its customers but also to improve its own products and services. The technology's capability to capture complete user sessions, including sensitive financial information displayed on password-protected pages, makes it particularly problematic for users who reasonably expect their private account information to remain confidential.

## IV. Edward Jones's Use of These Tracking Technologies

120. Edward Jones incorporated Tracking Technologies on the Edward Jones Properties from at least Google, Meta, LinkedIn, The Trade Desk, and ClickTale. Through these Tracking Technologies, Edward Jones disclosed Plaintiffs' and Class Members' private communications to these third parties, as well as identifiable information, including their IP address(es) and identifiable cookies that connect to personal information stored by Tracking Technology providers, such as their name, email address(es), precise location, mailing address(es), IP address(es), and phone number(s).

### A. Edward Jones Website

121. Prospective and current customers use the Edward Jones website to, among other things, find financial advisors and plan the details of their financial lives. Every prospective and current customer that visited the Edward Jones website had their identifiable PII, including IP address and identifiable cookies, and private data disclosed to and intercepted by third parties through at least Google, Meta, LinkedIn, The Trade Desk, and ClickTale Tracking Technologies.

122. This Tracking Technology was present when Edward Jones's customers and prospective customers visited the Edward Jones Properties, including on pages that provide a survey for customers and prospective customers to be "matched" to an advisor. This survey requires customers to provide highly personal and sensitive information: (1) zip code; (2) whether they currently work with a financial advisor; (3) goals to discuss with a financial advisor; (4) how much investing experience they have; (5) their age; (6) when they'd like to retire; (7) how much they are considering investing with a financial advisor; (8) how they generate income; (9) approximate annual household income; and any interest in: (10) LGBTQ+ financial considerations; or (11) military or veteran status.

123. When a customer or prospective customer completes this survey, The Trade Desk,

LinkedIn, Google, and Meta record that they completed each page. For example, as depicted in Figures 1 and 2, because the Google Tracking Technology was incorporated in the background of the Edward Jones Properties, Edward Jones disclosed and allowed Google to intercept and record that a prospective customer started a survey to find a financial advisor. This information was recorded as a "page_view" event containing at least the full-string URLs[24] revealing the page the prospective customer is currently on (via the "dl" field), the prior page they had visited (via the "dr" field), as well as the title of the page, a description, and keywords.

**FIGURE 1**

| | |
|---|---|
| en | page_view |
| dr | www.edwardjones.com |
| dl | https://match.edwardjones.com/survey |

124. Once the prospective customer completes the survey, Google intercepts and records additional information about the user, including full-string URLs revealing that the survey is now completed through the "page_view" event.

**FIGURE 2**

| | |
|---|---|
| en | page_view |
| dr | www.edwardjones.com |
| dl | https://match.edwardjones.com/matched-advisors |

125. But that is not all. Google also receives in the same transmission the prospective customer's first-party cookie values, including the "cid" and "sid" cookies, which are unique values that identify a

[24] Full-string URLs, as opposed to partial strings, reveal the specific page the individual is viewing or the action they are taking.

Google user's account. In addition, Google Tracking Technology receives prospective and current Edward Jones customers' IP addresses. This data allows Google to not only track and profile Edward Jones customers on its site, but also on other sites they visit as well.

126. Edward Jones also discloses customers' and prospective customers' data to Meta. Because the Meta Pixel was incorporated in the background of the financial advisor matching process, Edward Jones disclosed and allowed Meta to record that the prospective customer started the advisor matching survey at Edward Jones. This information was recorded as a "PageView" event containing at least the full-string URLs revealing the page the prospective customer is currently on (via the "dl" field), the prior page they had visited (via the "rl" field), as well as the Pixel ID identifying the specific tracking pixel deployed.

**FIGURE 3**

| | |
|---|---|
| ev | PageView |
| dl | https://match.edwardjones.com |
| rl | https://www.edwardjones.com |

127. As the prospective customer navigates through the financial advisor matching survey, Meta intercepts additional information about the user through multiple PageView events and full-string URLs revealing the specific financial questions being viewed.

**FIGURE 4**

| | |
|---|---|
| ep.page_path_2 | /survey |
| ep.page_id | currently-works-with-advisor |

128. As seen in Figure 4 above, Edward Jones disclosed and allowed Meta to intercept and record that a prospective customer navigates through the survey question that asks whether the prospective or current customer is currently working with a financial advisor.

**FIGURE 5**

| | |
|---|---|
| ep.page_path_2 | /survey |
| ep.page_id | current-savings |

129. As seen in Figure 5 above, Edward Jones disclosed and allowed Meta to intercept that a prospective customer navigates through the survey question that asks about the prospective or current customer's savings level.

130. These URLs are associated with the "dl" parameter visible in the Meta Pixel tracking requests, allowing Meta to track which financial questions the prospective customer views and the sequence in which they progress through the survey.

131. This data reveals that the customer or prospective customer is a strong candidate for professional financial advice, and each of these entities can use this data to profile the customer and serve them targeted ads.

132. Further, Edward Jones discloses customers' and prospective customers' data to LinkedIn.

133. As the user answers the "quiz" questions to be matched with a financial advisor, each individual response is communicated to LinkedIn through a "click" event. For example, when the user is asked if they currently work with a financial advisor, LinkedIn receives the answer.

**FIGURE 6**



134. Meanwhile, ClickTale receives a full recording of the customers' interactions. These recordings would include specific answers to survey questions, such as a current or prospective customer's response that they are interested in investing between $50,000 and $99,000 with a financial advisor, or that their annual household income is between $45,000 and $139,999.

135. No third-party advertising companies, including those listed above, would have access to Plaintiffs' and Class Members' PII and private financial data absent Edward Jones incorporating this technology on the Edward Jones Properties.

136. And this is likely only part of the private data they receive. As explained above, Edward Jones likely discloses even more information to these entities through server-to-server integrations by uploading lists containing individual PII to enhance ad targeting, information which can only be revealed through discovery.

**B. Edward Jones Customer Portal**

137. Edward Jones also provides each customer with access to the Edward Jones customer portal to review their transaction history, account balances, and more.

138. Edward Jones incorporates multiple Tracking Technologies on these password-protected customer portals. This includes Google Analytics, Google Tag Manager, Google DoubleClick, and Google Ads. As a result, Edward Jones disclosed customers' communications on these web properties to third parties, including Google. Google receives the customer's IP address, browser information, and the unique "cid" cookie that Google uses to uniquely identify each Edward Jones customer in its own systems, as well as full-string URLs reflecting that the customer has logged into the Edward Jones customer portal via the "dl" and "dr" fields.

**FIGURE 7**

| | |
|---|---|
| dl | https://onlineaccess.edwardjones.com/app/oa-login |
| dr | https://www.edwardjones.com/ |

139. The data Edward Jones disclosed, and allowed Google to intercept and record, reveals extensive financial and account information. Together, Google gets a 360-view of Plaintiffs' and Class Members' financial status, account information, retirement goals, and more.

140. For instance, within the Edward Jones customer portal, Google records IP addresses, user-agent information which is used to create a digital "fingerprint" of individuals' devices for tracking purposes, and a host of user and device identifiers. This includes the Customer ID (seen as "cid" in network traffic), the Session ID ("sid"), Google Analytics ID, Session GUIDs, and other Tracking IDs. Each of these pieces of information, as described in Section III.A, is used to uniquely identify each user on Google's systems.

141. Edward Jones allowed Google to intercept and record each full-string URL reflecting the page the customer queried and searched for.

**FIGURE 8**

| | |
|---|---|
| dl | https://onlineaccess.edwardjones.com/app/accounts/loans-credit |

142. As seen in the example of Figure 8 above, Edward Jones disclosed and allowed Google to intercept and record that the customer was interested in lines of credit and loans.

143. Edward Jones also disclosed to Google specific account information. The request shows the type of account (for example, "Single-1"), the last four digits of the account number, and the customer's transaction history.

144. Edward Jones has also configured Google's Tracking Technology for an even more egregious privacy violation. Like LinkedIn on the public survey, Google receives a "click" event when the user selects a button to view their account activity.

**FIGURE 9**

Document location (dl): https://onlineaccess.edwardjones.com/app/accounts/activity
Document referrer (dr): https://www.edwardjones.com/
Document title (dt): Accounts | Edward Jones
Hit counter (_s): 12
tfd (tfd): 380198
Event name (en): Click Event

145. Through these events, Edward Jones not only received the full-string URL of the page the user visits (which is the content of a communication with the portal in itself), the technology is also configured in such a way that Google receives a string of the transactions associated with the user's account going back months or years, detailing granular information reflecting the amounts deposited, what bank deposits are made from, transaction information reflecting purchases or sales of investments, the amount of shares purchased, the share price, the amount of dividends received and how they are reinvested, and charges reflecting monthly platform fees. Though Figure 10 is heavily redacted to protect the user's privacy, each red box reflects a different transaction intercepted by Google.

146. As Figure 10 shows, Google also receives information about the value of the individual accounts, including those with Edward Jones, and any other linked accounts, as reflected by "Accounts Total Value".

**FIGURE 10**

Event name (en): Click Event
Event param: Click text (ep.Click text): Accounts Total Value $[redacted] Edward Jones Value $[redacted] Total Liabilities $[redacted]Account Actions Connect Accounts Overview Activity search Time Frame Last 30 Days This Month Last 60 Days Last 90 Days Custom Start Date Format as mm/dd/yyyy End Date Format as mm/dd/yyyy Date Account Type Description Shares Price Amount 1/21/2026 Single-1 ****8027 Monthly Reinvestment [redacted]- - $[redacted] 1/21/2026 Single-1 ****8027 Buy [redacted] $[redacted] -$[redacted] 1/20/2026 Single-1 ****8027 Fee Offset [redacted] $[redacted] 1/16/2026 Single-1 ****8027 Electronic Transfer from [redacted]- - $[redacted] 1/16/2026 Single-1 ****8027 Buy [redacted] $[redacted] -$[redacted] 1/8/2026 Single-1 ****8027 Program & Platform Fees [redacted] /7/2026 Single-1 ****8027 Dividend [redacted] $[redacted] 1/7/2026 Single-1 ****8027 Reinvestment into [redacted] - - -$[redacted] /2/2026 Single-1 ****8027 Monthly Reinvestment [redacted].. [redacted]- $[redacted] /2/2026 Single-1 ****8027 Reinvestment into [redacted] $[redacted] /2/2026 Single-1 ****8027 Dividend [redacted] $[redacted] 12/31/2025 Single-1 ****8027 Reinvestment into [redacted] $[redacted] /31/2025 Single-1 ****8027 Dividend [redacted] $[redacted] 2/30/2025 Single-1 ****8027 Reinvestment into [redacted] $[redacted] 2/30/2025 Single-1 ****8027 Dividend [redacted]- - $[redacted] 12/26/2025 Single-1 ****8027 Reinvestment into [redacted] - - -$[redacted]

147. No third parties would have access to Plaintiffs' and Class Members' private financial data absent Edward Jones's incorporation of these Tracking Technologies on the Edward Jones Properties.

148. And this is likely only part of the private data they receive. As explained above, Edward Jones likely discloses even more information to these entities through server-to-server integrations by uploading lists containing individual PII to enhance ad targeting, information which can only be revealed

through discovery.

**V. Plaintiffs and Class Members Do Not Consent to Edward Jones's Disclosure of Their Sensitive Information**

149. Plaintiffs and Class Members had no way of knowing that Edward Jones was disclosing and allowing third parties to intercept and record their private data, including sensitive personal financial records, their IP addresses, and their identifiable cookies, when they engaged with the Edward Jones Properties because the Tracking Technologies were inconspicuously incorporated in code running in the background.

150. This undisclosed conduct is all the more egregious given the nature of the information entered into the Edward Jones Properties, e.g., PII and personal financial records. Plaintiffs and Class Members would not reasonably expect this information would be disclosed or intercepted without their consent, given its private nature and laws like the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801, *et seq.*, and the California Financial Information Privacy Act ("CFIPA"), Cal. Fin. Code § 4050, *et seq.*, designed to protect it.

151. Because Edward Jones failed to disclose that third parties would be intercepting users' sensitive financial records, their IP addresses, and their identifiable cookies, users, including Plaintiffs and Class Members, reasonably believed their private data, including personal financial records, would not be disclosed or used by third parties.

**VI. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their User Data**

152. Plaintiffs and Class Members have a reasonable expectation of privacy in their private communications on the Edward Jones Properties, including their financial records.

153. Privacy polls and studies uniformly show that the overwhelming majority of Americans believe that companies should seek a customer's affirmative consent before collecting and sharing their personal data.

154. For example, a study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and about the same percentage believe internet companies and websites should be

required to provide consumers with a complete list of the data that has been collected about them.[25] Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how companies are using data they collect about them.[26]

155. Users act consistently with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data with third parties when prompted.[27]

156. Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government. The same study revealed that 75% of people would abandon brands that do not take care of their data.[28]

157. Edward Jones's disclosure of Plaintiffs' and Class Members' private communications, including private financial records, violates Plaintiffs' and Class Members' privacy interests.

158. This is especially true in light of the federal and state laws that exist specifically to protect the disclosure of this type of information, including the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801, *et seq*., and the California Financial Information Privacy Act ("CFIPA"), Cal. Fin. Code § 4050, *et seq*.

---

[25] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/?srsltid=AfmBOooZKcKElpRb-k9bvaOyAs93buRiD7f-WN1mFLMcULcWrE2TgAGb (last visited Jun. 17, 2026).

[26] Brook Auxier, Lee Rainie, et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/ (last visited Jun. 17, 2026).

[27] Michael Grothaus, *Apple's newest ad perfectly visualizes how App Tracking Transparency stops companies from stalking you*, FAST COMPANY (May 20, 2021), https://www.fastcompany.com/90638821/apples-newest-ad-perfectly-visualizes-how-its-app-tracking-transparency-privacy-feature-stops-companies-from-stalking-you?partner=feedburner&utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+fastcompany%2Fheadlines+%28Fast+Company%29/ (last visited Jun. 17, 2026).

[28] *New DataGrail Research, The Great Privacy Awakening, Underscores How Far People are Willing to Go to Protect Their Personal Information in Absence of Federal Regulations*, DATAGRAIL (Oct. 27, 2022), https://www.datagrail.io/press/new-datagrail-research-the-great-privacy-awakening/ (last visited Jun. 17, 2026).

159. As described above, both GLBA and CFIPA protect NPI.

160. Examples of NPI include: (i) information a consumer provides to a financial institution "on an application to obtain . . .[a] financial product or service"; (ii) "[a]ccount balance information, payment history"; (iii) "[t]he fact that an individual is or has been . . .[a] customer[] or has obtained a financial product or service from [the financial institution]"; (iv) "[a]ny information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [its] consumer"; and (v) "[a]ny information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)." 16 C.F.R. § 313.3(o)(2)(i).

161. Edward Jones disclosed and allowed each of the third-party Tracking Technologies above to intercept, record, and collect NPI, including, at least, customers' (1) account numbers; (2) full transaction histories; (3) account balances; (4) contributions; and (5) fees charged for financial services.

162. The existence of GLBA and CFIPA—designed to protect the records at issue here—further confirms that Plaintiffs and Class Members have a reasonable expectation not to have their PII and financial data disclosed to third parties.

## VII. Edward Jones Users' Private Data Has Value

163. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling user data. That number has likely increased since then given the ever-increasing value of user data in an increasingly digital world.

164. Consistent with this trend, multiple companies now offer to *pay* consumers to track them online and collect their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are just a few examples of companies that pay for browsing history information.

165. Meta also has paid users for their digital information, including browsing history. Until 2019, Meta ran a "Facebook Research" app through which it paid individuals $20 a month to collect browsing history information and other communications.

166. The financial-based data Edward Jones disclosed is particularly valuable. The market for consumer data was worth as much as $200 billion.[29] Consumer transaction data is particularly "powerful,"

[29] Catherine Tucker, *Buying Consumer Data? Tread Carefully*, HARVARD BUS. REV. (May 1, 2020), https://hbr.org/2020/05/buying-consumer-data-tread-carefully (last visited Jun. 17, 2026).

providing business insight into revenue forecasts and strategic decision-making to predict the future performance of a business.[30]

167. Credit and debit card transaction data alone was valued at $1.2 billion in 2023.[31] Full transaction data sets can sell anywhere from $500,000 to $2 million annually.[32] Smaller subsets of this data can sell for $30,000 to $50,000.[33]

168. Financial data such as credit card details can sell for up to $120, individually.[34]

169. Financial data beyond transactions offers insights for advertisers. Google, for example, has a specific advertising function to allow advertisers to target based on household income level.[35] Advertisers purchase data sets that facilitate this type of advertising, such as those reflecting individuals' net worth, including assets like those Edward Jones disclosed to Google.

170. Had Plaintiffs or Class Members known of Edward Jones's disclosure of private information to third parties and its misappropriation and misuse of such data, they would not have paid or would have paid less for Edward Jones's services.

**TOLLING**

171. The applicable statutes of limitations have been tolled as a result of Edward Jones's knowing and active concealment and denial of the facts alleged herein.

172. Edward Jones secretly incorporated Tracking Technologies on the Edward Jones Properties, providing no indication to users that they were interacting with sites that shared their private

---

[30] Dallan Ryan, *Consumer Transaction Data: Unveiling Trends and Spending Patterns,* EAGLE ALPHA, https://www.eaglealpha.com/2024/04/11/consumer-transaction-data-trends-insights/#:~:text=Understanding%20Consumer%20Transaction%20Data%20is,or%20miss%20Wall%20Street%20estimates (last visited Feb. 4, 2026).

[31] *Credit & Debit Card Transactions - Alternative Data Market Statistics*, Grand View Horizon, https://www.grandviewresearch.com/horizon/statistics/alternative-data-market/data-type/credit-debit-card-transactions/global (last visited Feb. 4, 2026).

[32] *Consumer Transaction Data*, NAVIGATOR – EAGLE ALPHA, https://dsg.eaglealpha.com/consumer-transaction-alternative-data/ (last visited Feb. 4, 2026).

[33] *Id.*

[34] Emma Zaballos, *The Dark Web: Where stolen data becomes currency*, SC MEDIA (Jan. 2, 2025) https://www.scworld.com/perspective/the-dark-web-where-stolen-data-becomes-currency (last visited Jun. 19, 2026).

[35] *About Demographic Targeting*, GOOGLE ADS HELP, https://support.google.com/google-ads/answer/2580383 (last visited Feb. 4, 2026).

information with third parties, including their financial records.

173. Edward Jones had exclusive knowledge that the Edward Jones Properties incorporated Tracking Technologies, and/or that by interacting with the Edward Jones Properties, Plaintiffs' and Class Members' private and financial information would be disclosed to and intercepted by third parties. Edward Jones failed to disclose these facts to users.

174. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Edward Jones's conduct, including because doing so requires highly specialized technical skill (i.e., the Tracking Technology is source code embedded in web properties) and there were no disclosures or other indication that would inform a reasonable Edward Jones user that Edward Jones was disclosing their private communications to third parties, including Google.

175. The earliest Plaintiffs and Class Members could have discovered the critical facts of their injuries and their cause was during technical analysis conducted shortly before the filing of this Complaint.

176. Edward Jones had a duty to disclose the nature and significance of its data sharing practices but did not do so. Edward Jones is therefore estopped from relying on any statute of limitations under the discovery rule.

177. Additionally, Edward Jones engaged in fraudulent conduct to prevent Plaintiffs and Class Members from discovering the disclosure of their data to third parties. Edward Jones misled Plaintiffs and Class Members to believe their Private Information, including financial records, would not be disclosed to any third parties through its representations described herein.

178. Plaintiffs and Class Members were not aware that Edward Jones disclosed their Private Information, including financial records.

179. Plaintiffs and Class Members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Edward Jones's misconduct by virtue of their fraudulent concealment.

180. Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

181. **Class Definition:** Plaintiffs bring this action on behalf of themselves and other similarly

situated individuals (the "Classes"), defined as:

> **Nationwide Class:** All natural persons in the United States and its territories who, during the Class Period, used the Edward Jones Properties, and had their private communications disclosed to and/or intercepted or recorded by third parties via the Tracking Technologies.

> **California Subclass:** All natural persons in California who, during the Class Period, used the Edward Jones Properties, and had their private communications disclosed to and/or intercepted or recorded by third parties via the Tracking Technologies.

182. Plaintiffs reserve the right to modify the class definitions or add subclasses as needed prior to filing a motion for class certification.

183. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment or preliminary approval of a settlement.

184. Excluded from the Classes are Edward Jones; any affiliate, parent, or subsidiary of Edward Jones; any entity in which Edward Jones has a controlling interest; any officer, director, or employee of Edward Jones; any successor or assign of Edward Jones; anyone employed by counsel in this action; any judge to whom this case is assigned, their spouse and immediate family members; and members of the judge's staff.

185. Numerosity/Ascertainability. Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs currently. However, it is estimated that there are thousands of individuals in the Classes.

186. Typicality. Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs used the Edward Jones Properties and had their PII and private data disclosed to third parties such as Google without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

187. Adequacy. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the

Class Members.

188. Common Questions of Law and Fact Predominate/Well-Defined Community of Interest. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Edward Jones has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Edward Jones's wrongful conduct. The following questions of law and fact are common to the Classes:

(a) Whether Edward Jones intentionally incorporated the Tracking Technologies;

(b) Whether the Edward Jones Properties surreptitiously track PII and protected communications, and simultaneously disclose that information to third parties;

(c) Whether the third-party Tracking Technology providers are third-party eavesdroppers;

(d) Whether Edward Jones violated Plaintiffs' and Class Members' privacy rights by using Tracking Technologies to communicate users' Private Information to third parties; and

(e) Whether Plaintiffs and Class Members are entitled to damages under the ECPA, CIPA, or any other relevant statutes.

189. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action. Plaintiffs are unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Violation Of the Electronic Communications Privacy Act**
**18 U.S.C. § 2510, *et seq.***
**(on behalf of Plaintiffs and the Nationwide Class)**

190. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Nationwide Class.

191. The ECPA prohibits the intentional interception of or procuring another person to intercept the contents of any electronic communication and the use of information obtained through the interception of any electronic communication. 18 U.S.C. § 2511.

192. The ECPA protects both the sending and receipt of communications.

193. The ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

194. At all relevant times, Edward Jones aided, employed, agreed with, conspired with, and procured third parties, including at least Google, Meta, The Trade Desk, LinkedIn, and ClickTale, to track and intercept Plaintiffs' and Nationwide Class Members' internet communications while accessing the Edward Jones Properties, and to use these intercepted communications. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiffs and Nationwide Class Members.

195. The transmissions of data between Plaintiffs and Nationwide Class Members and Edward Jones qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

196. Edward Jones intentionally inserted an electronic listening device onto Plaintiffs' and Nationwide Class Members' web browsers that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications with Edward Jones to, at least, the Tracking Technologies described herein.

197. Edward Jones willingly facilitated third parties' interception, recording, and collection of Plaintiffs' and Nationwide Class Members' private communications by embedding the Tracking Technologies on the Edward Jones Properties and used the intercepted communications for its own analytics and advertising. Edward Jones played an active role in the use of the third-party Tracking Technologies by customizing and deploying the third-party Tracking Technologies on the Edward Jones Properties. Edward Jones has full control over the Tracking Technologies, including which webpages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

198. The Tracking Technologies constitute "devices" within the meaning of 18 U.S.C. § 2510(5).

199. Edward Jones failed to disclose its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and Nationwide Class Members' communications with Edward Jones to undisclosed third parties.

200. The Tracking Technologies are designed such that they transmit a website user's actions and communications contemporaneously as the user initiates each communication. As a result, the communications were intercepted in transit to the intended recipient—Edward Jones—before reaching Edward Jones's server.

201. The third-party advertising companies that make these Tracking Technologies are not parties to Plaintiffs' and Nationwide Class Members' communications with Edward Jones.

202. As demonstrated herein, Edward Jones violated ECPA by aiding and permitting third parties to intercept and receive its users' online communications in real time as they were made via the Edward Jones Properties, and by then using these intercepted communications for its own analytics and advertising. Importantly, Google, Meta, LinkedIn, The Trade Desk, and ClickTale would not have intercepted or received the contents of these communications (or even had access to them) but for Edward Jones's actions and incorporations of the Tracking Technologies into the Edward Jones Properties.

203. In aiding and permitting third parties to intercept its users' online communications, Edward Jones had a purpose that was tortious. The unauthorized disclosure of private communications to profit from the information is tortious in and of itself. Edward Jones intentionally committed a tortious act by disclosing private communications to third parties, allowing them to record individually identifiable financial information without authorization to do so, and associating the content of Plaintiffs' and Nationwide Class Members' communications in a manner that exceeds what Edward Jones disclosed to Plaintiffs and Nationwide Class Members.

204. In aiding and permitting third parties to intercept its users' online communications, Edward Jones had a purpose that was criminal and designed to violate state and federal constitutional and statutory provisions including:

(a) GLBA and CFIPA. *See* 15 U.S.C. §§ 6802(a)-(b); Cal. Fin. Code §§ 4052.5; 4053. Edward Jones violated GLBA and CFIPA by intentionally disclosing individually identifiable information from financial records without consent.

(b) A knowing intrusion upon Plaintiffs' and Nationwide Class Members' seclusion;

(c) California Invasion of Privacy Act ("CIPA");

(d) Various state consumer protection statutes, including but not limited to the Unfair Competition Law; and

(e) Various state computer privacy and property statutes, including but not limited to the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502.

205. Plaintiffs and Nationwide Class Members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [Edward Jones] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C. § 2520. This includes monetary damages for the greater of (i) the sum of the actual damages suffered by the Plaintiffs and any profits made by Edward Jones as a result of the violation, or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

**<u>SECOND CAUSE OF ACTION</u>**
**Violation Of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**
**(on behalf of Plaintiffs and the California Subclass)**

206. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Subclass.

207. The California Legislature enacted the CIPA, Cal. Penal Code §§ 630, *et seq*., finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

208. Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read,

or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

209. Edward Jones is a person for purposes of § 631.

210. The Tracking Technologies (i.e., Google Analytics, Google Tag Manager, Google Ads, Google DoubleClick, the Meta Pixel, LinkedIn Insight Tag, and ClickTale Session Replay) and Plaintiffs' and California Subclass Members' computers and mobile devices are a "machine, instrument, contrivance, or . . . other manner" under § 631.

211. Under CIPA, a defendant must show it had the consent of all parties to a communication.

212. At all relevant times, Edward Jones aided, employed, agreed with, and conspired with third parties, including at least Google, Meta, LinkedIn, The Trade Desk, and ClickTale to track and intercept Plaintiffs' and California Subclass Members' internet communications while accessing the Edward Jones Properties. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiffs and California Subclass Members.

213. Edward Jones intentionally inserted an electronic listening device onto Plaintiffs' and California Subclass Members' web browsers that, without their knowledge and consent, tracked, intercepted, and transmitted the substance of their confidential communications with Edward Jones to Google, Meta, LinkedIn, The Trade Desk, and ClickTale—who constitute "persons" within the meaning of the statute.

214. Edward Jones willingly facilitated third parties' interception and collection of Plaintiffs' and California Subclass Members' private financial information by embedding the Tracking Technologies on the Edward Jones Properties. Edward Jones has full control over the Tracking Technologies, including which webpages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

215. Edward Jones failed to disclose its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and California Subclass Members' communications with Edward Jones to undisclosed third parties.

216. The Tracking Technologies are designed such that they transmit a website user's actions and communications contemporaneously as the user initiates each communication. These third parties immediately act on the communications in real time. As a result, the communications were intercepted in transit to the intended recipient—Edward Jones—before reaching Edward Jones's server.

217. As demonstrated above, Edward Jones violated CIPA § 631 by aiding in and permitting third parties to intercept and receive its users' online communications in real time as they were made via the Edward Jones Properties. Importantly, Google, Meta, LinkedIn, The Trade Desk, ClickTale, and other unauthorized third parties would not have been able to intercept or receive the contents of these communications but for Edward Jones's actions and incorporations of the Tracking Technologies into the Edward Jones Properties.

218. By disclosing Plaintiffs' and California Subclass Members' Private Information, including financial records, Edward Jones violated Plaintiffs' and California Subclass Members' statutorily protected right to privacy.

219. As a result of the above violations and pursuant to CIPA Section 637.2, Edward Jones is liable to Plaintiffs and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

## THIRD CAUSE OF ACTION
**Violation Of the California Invasion of Privacy Act**
**Cal. Penal Code § 632**
**(on behalf of Plaintiffs and the California Subclass)**

220. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Subclass.

221. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

222. § 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

223. Plaintiffs' and California Subclass Members' communications to Edward Jones, including their sensitive personal and financial information, were confidential communications for purposes of § 632, because Plaintiffs and California Subclass Members had an objectively reasonable expectation of privacy in this data.

224. Plaintiffs and California Subclass Members expected their communications to be confined to Edward Jones in part, due to the protected nature of the information at issue. Plaintiffs and California Subclass Members did not expect Google, Meta, The Trade Desk, LinkedIn, ClickTale, or any third party to secretly eavesdrop upon or record this confidential information and their communications.

225. The Tracking Technologies are all electronic amplifying or recording devices for purposes of § 632.

226. Edward Jones contemporaneously recorded and eavesdropped on Plaintiffs and California Subclass Members through electronic amplifying or recording devices, i.e., by using Google, Meta, The Trade Desk, LinkedIn, and ClickTale's Tracking Technologies, in violation of § 632 of CIPA.

227. At no time did Plaintiffs or California Subclass Members consent to this conduct, nor could they reasonably expect that their communications would be overheard or recorded by third parties.

228. Google, Meta, The Trade Desk, LinkedIn, and ClickTale each utilized Plaintiffs' and California Subclass Members' sensitive personal and financial information for their own purposes, including for targeted advertising.

229. Plaintiffs and California Subclass Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

230. Plaintiffs and California Subclass Members have also suffered irreparable injury from these unauthorized acts. Plaintiffs' and California Subclass Members' sensitive data has been collected, viewed, accessed, and stored by Edward Jones, Google, Meta, The Trade Desk, LinkedIn, and ClickTale, has not been destroyed, and due to the continuing threat of such injury, Plaintiffs and California Subclass Members have no adequate remedy at law. Plaintiffs and California Subclass Members are accordingly entitled to injunctive relief.

**FOURTH CAUSE OF ACTION**
**California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code §§ 638.50 & 638.51**
**(on behalf of Plaintiffs and the California Subclass)**

231. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Subclass.

232. CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

233. Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

234. CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace device without a court order.

235. Edward Jones is a person under CIPA § 638.51.

236. Edward Jones implemented and installed the Tracking Technologies—which are pen registers and/or trap and trace devices—on Plaintiffs' and California Subclass Members' devices and browsers.

237. These Tracking Technologies captured "routing, addressing, or signaling information" because they intercept unique user and device identifiers, including IP address, and cookies used for purposes of identification.

238. Edward Jones was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiffs' and California Subclass Members' routing, addressing, or signaling information as alleged herein.

239. Plaintiffs and California Subclass Members did not consent to Edward Jones's installation of a pen register or trap and trace device on their devices and browsers.

240. Plaintiffs and California Subclass Members have been harmed as a result of Edward Jones's conduct. Edward Jones did not have authorization to use pen registers and/or trap and trace devices to surveil and identify Plaintiffs and California Subclass Members or other routing, addressing, and signaling information revealing who the intended recipients of their communications were.

241. Plaintiffs and California Subclass Members face an imminent threat of continued injury, as this data continues to be stored and used, including by third parties providing the Tracking Technology alleged above, such that Plaintiffs and California Subclass Members have no adequate remedy at law.

242. Plaintiffs and California Subclass Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the California Subclass in an amount to be proven at trial, as well as injunctive or other equitable relief.

## FIFTH CAUSE OF ACTION

**Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On behalf of Plaintiffs and the Nationwide Class)**

243. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Nationwide Class.

244. Plaintiffs and Nationwide Class Members had a reasonable expectation of privacy in their communications with Edward Jones via the Edward Jones Properties.

245. Plaintiffs and Nationwide Class Members communicated sensitive and protected financial information and individually identifiable information, including on password-protected pages and customer portals, that they intended for only Edward Jones to receive and which they understood Edward Jones would keep private.

246. Edward Jones's disclosure of the substance and nature of Plaintiffs' and Nationwide Class Members' communications to third parties without their knowledge and consent is an intentional intrusion

on Plaintiffs' and Nationwide Class Members' solitude or seclusion.

247. Plaintiffs and Nationwide Class Members had a reasonable expectation that their communications, identity, financial information and other data would remain confidential, and that Edward Jones would not install Tracking Technologies on the Edward Jones Properties to secretly transmit their communications to unauthorized third parties.

248. Edward Jones was authorized to receive Plaintiffs' and Nationwide Class Members' private and financial information from their respective web browsers when they used the Edward Jones Properties, but it was not authorized to force Plaintiffs' and Nationwide Class Members' web browsers to transmit information to Google and other third parties without their consent or authorization.

249. Edward Jones therefore obtained Plaintiffs' and Nationwide Class Members' private and financial information under false pretenses and/or exceeded its authority to obtain such information.

250. As a result of Edward Jones's actions, Plaintiffs and Nationwide Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

251. Plaintiffs and Nationwide Class Members have been damaged as a direct and proximate result of Edward Jones's invasion of their privacy and are entitled to just compensation, including monetary damages.

252. Plaintiffs and Nationwide Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Nationwide Class Members for the harm to their privacy interests because of Edward Jones's intrusions upon Plaintiffs' and Nationwide Class Members' privacy, as well as nominal damages.

253. Plaintiffs and Nationwide Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Edward Jones's actions, directed at injuring Plaintiffs and Nationwide Class Members in conscious disregard of their rights. Such damages are needed to deter Edward Jones from engaging in such conduct in the future.

254. Plaintiffs also seek such other relief as the Court may deem just and proper.

## SIXTH CAUSE OF ACTION
**Article I, Section 1 of the California Constitution (Invasion of Privacy)**
**(On behalf of Plaintiffs and the California Subclass)**

255. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth

herein and bring this claim individually and on behalf of the proposed California Subclass.

256. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

257. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

258. The right to privacy in California's Constitution creates a right of action against private and government entities.

259. Plaintiffs and California Subclass Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section 1 of the California Constitution.

260. The identifiable and private information Edward Jones disclosed to third parties without Plaintiffs' and California Subclass Members' consent was used, among other things, for targeted advertising purposes. The manner in which Edward Jones disclosed this information defeated established privacy mechanisms, including GLBA and CFIPA, and social norms.

261. This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there are third parties intercepting their private financial information, let alone using it for profit.

262. Edward Jones's conduct violated the privacy of hundreds of thousands (if not millions) of California Subclass Members, including Plaintiffs. Edward Jones did not have consent to disclose this information.

263. Plaintiffs and California Subclass Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Edward Jones as a result of its intrusion upon seclusion.

264. Edward Jones's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' or California Subclass Members' rights. Plaintiffs and California Subclass Members are entitled to punitive and exemplary damages.

265. Plaintiffs and California Subclass Members also seek any other relief the Court may deem just and proper.

**SEVENTH CAUSE OF ACTION**
**Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(On behalf of Plaintiffs and the California Subclass)**

266. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Subclass.

267. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200.

268. Edward Jones is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

269. Edward Jones violated the UCL by engaging in unlawful and unfair business acts and practices.

270. Edward Jones's "unlawful" acts and practices include its violation of GLBA and CFIPA, the ECPA, CIPA, Cal. Penal Code §§ 630, *et seq.*; the CDAFA, Cal. Penal Code § 502, and the common law right of privacy.

271. Edward Jones's conduct violated the spirit and letter of these laws, which protect property and privacy interests and prohibit the unauthorized disclosure of private communications and personal information, including financial information.

272. Edward Jones's "unfair" acts and practices include its surreptitious disclosure of private communications and personal information, including Plaintiffs' and California Subclass Members' financial information without consent.

273. Plaintiffs and California Subclass Members were completely unaware of Edward Jones's conduct and could not have anticipated Edward Jones's intrusion into their privacy through its unlawful and unfair disclosure of their personal financial information and private communications to third parties,

including Google. Accordingly, Plaintiffs and California Subclass Members could not avoid the harm Edward Jones caused.

274. Edward Jones's conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and California Subclass Members. Further, the gravity of the harm of Edward Jones's secret disclosure of Plaintiffs' and California Subclass Members' personal financial information and private communications is significant, and there is no corresponding benefit resulting from such conduct.

275. Plaintiffs and California Subclass Members have suffered injury, including the loss of money and/or property as a result of Edward Jones's unfair and unlawful practice of disclosing Plaintiffs' and California Subclass Members' personal financial information and private communications, which has economic value, to third parties, including Google, Meta, LinkedIn, The Trade Desk, and ClickTale.

276. Plaintiffs and California Subclass Members have suffered harm in the form of diminution in the value of their personal information and private communications.

277. Edward Jones caused damage to and loss of Plaintiffs' and California Subclass Members' property right to control the dissemination and use of their personal information and private communications.

278. Edward Jones has reaped unjust profits and revenues in violation of the UCL as a result of its unlawful and unfair conduct, including profits and revenues from its use of Plaintiffs' and California Subclass Members' data for targeted advertising. Plaintiffs and California Subclass Members seek restitution and disgorgement of these unjust profits and revenues.

279. Plaintiffs and California Subclass Members seek all monetary and non-monetary relief allowed under the statute and equity, including restitution; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief permissible under the UCL.

280. To the extent Plaintiffs do not have an adequate remedy at law, they plead their claims under the UCL in the alternative to their legal claims. Legal remedies available to Plaintiffs and California Subclass Members are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not as equally certain as restitution because the standard that

governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiffs failed to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Equitable relief, including restitution, entitles Plaintiffs to recover all profits from the wrongdoing, which may exceed the available damages at law.

**<u>EIGHTH CAUSE OF ACTION</u>**
**Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502**
**(On behalf of Plaintiffs and the California Subclass)**

281. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Subclass.

282. The California Legislature enacted CDAFA to "expand the degree of protection afforded. . . from tampering, interference, damage, and unauthorized access to [(including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

283. Plaintiffs' and California Subclass Members' devices on which Edward Jones installed the third-party Tracking Technologies, including their computers, smart phones, and tablets, constitute "computer systems" within the meaning of the CDAFA. *Id.* § 502(b)(5).

284. The data that Edward Jones accessed and disclosed from Plaintiffs' and California Subclass Members' devices constitutes "Data" within the meaning of the CDAFA. *Id.* § 502(b)(8).

285. Edward Jones violated § 502(c)(1) of the CDAFA by knowingly accessing without permission Plaintiffs' and California Subclass Members' devices and placing pixels, cookies, and other Tracking Technologies on their devices and local storage, in order to wrongfully obtain, disclose, and use their personal data in violation of users' reasonable expectations of privacy in their devices and data.

286. Edward Jones violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiffs' and the California Subclass Members' unique identifiers and other personal data from their devices.

287. Plaintiffs' and the California Subclass Members' device functionalities, device systems, device networks, and browsers constitute "computer services" within the meaning of the CDAFA. Edward Jones violated § 502(c)(3) by knowingly and without permission causing them to be used and accessed by third parties through the third-party Tracking Technology and identifying mechanisms incorporated on the Edward Jones Properties.

288. Plaintiffs' and California Subclass Members' devices, device systems, device networks, and browsers constitute "computer, computer system, or computer network" within the meaning of the CDAFA. Edward Jones violated § 502(c)(7) by knowingly and without permission causing those devices, device systems, device networks, and browsers to be accessed through third-party Tracking Technology and identifying mechanisms incorporated on Edward Jones Properties.

289. Edward Jones violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiffs and California Subclass Members, providing and/or assisting in providing advertisers, including Google, Meta, The Trade Desk, LinkedIn, and ClickTale, the ability to access Plaintiffs' and California Subclass Members' devices, device systems, device networks, and browsers via the Tracking Technology and identifying mechanisms incorporated on Edward Jones Properties.

290. Under § 502(b)(12) of the CDAFA, a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." The Tracking Technology Edward Jones incorporated on Edward Jones Properties constitutes computer contaminants as defined by § 502(b)(12) of the CDAFA. Edward Jones violated § 502(c)(8) by knowingly and without permission introducing computer contaminants, including Google's Tracking Technology, on Plaintiffs' and California Subclass Members' devices, device systems, device networks, and browsers, which intercepted and disclosed their personal financial data to third parties. As described *supra*, the Tracking Technology is deeply hidden on Edward Jones Properties; Plaintiffs and California Subclass Members had no way to remove it or opt out of its functionality.

291. Plaintiffs and California Subclass Members suffered damage and loss as a result of Edward Jones's conduct. Edward Jones's practices have deprived Plaintiffs and the California Subclass Members of control over their valuable property (namely, their sensitive personal financial data), the ability to receive compensation for that data, and the ability to withhold their data for sale. Plaintiffs and California Subclass Members suffered harm because Edward Jones unjustly profited from the PII and private data Edward Jones disclosed by using it for its own business purposes, like targeted advertising. Edward Jones's use of Tracking Technology has caused harm to Plaintiffs and California Subclass Members by taking up additional bandwidth, CPU time, data usage, and power consumption in their devices. Edward Jones's practices have also violated Plaintiffs' and California Subclass Members' private interests by collecting and disclosing their PII and other private information.

292. Plaintiffs and California Subclass Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

293. Plaintiffs and California Subclass Members have also suffered irreparable and incalculable harm and injuries from Edward Jones's violations. The harm will continue unless Edward Jones is enjoined from further violations of this section. Plaintiffs and California Subclass Members have no adequate remedy at law.

294. Plaintiffs and the California Subclass Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Edward Jones's violations were willful and, upon information and belief, Edward Jones is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiffs and California Subclass Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

## <u>NINTH CAUSE OF ACTION</u>

**Negligence**

**(in the Alternative, on behalf of Plaintiffs and the Nationwide Class)**

295. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Nationwide Class.

296. While Edward Jones's conduct was by all means intentional, it was at the very least (and in the alternative) negligent.

297. Edward Jones is a financial brokerage institution whose customers and prospective

customers, including Plaintiffs and Nationwide Class Members, entrust it with their sensitive personal and financial information in connection with using Edward Jones Properties.

298. Given the highly sensitive nature of the personal and financial information, and likelihood of harm resulting from its unauthorized disclosure, multiple statutes, regulations, and guidelines, including GLBA and CFIPA, in addition to the common law, impose a duty on Edward Jones to protect this information.

299. Edward Jones owed a duty of care to Plaintiffs and Nationwide Class Members to exercise reasonable care to protect their information consistent with the various statutory requirements, regulations, guidelines, and common law, including by not incorporating Tracking Technology on its Properties.

300. Edward Jones's duty of care arose as a result of, among other things, the special relationship that existed between Edward Jones and its customers and prospective customers. Edward Jones was the only party in a position to ensure that it was sufficiently protecting Plaintiffs' and Nationwide Class Members' sensitive personal information, including financial information, from unauthorized disclosure to third parties, including Google, Meta, LinkedIn, The Trade Desk, and ClickTale.

301. Edward Jones breached its duty to exercise reasonable care in protecting Plaintiffs' and Nationwide Class Members' sensitive personal information, including financial information, when it disclosed this information without authorization to third parties, including Google, Meta, LinkedIn, The Trade Desk, and ClickTale.

302. It was foreseeable to Edward Jones that the unauthorized disclosure of Plaintiffs' and Nationwide Class Members' sensitive personal information, including financial information, could result in injury to its customers and prospective customers.

303. As a direct and proximate result of Edward Jones's negligence, Plaintiffs and Nationwide Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
**Unjust Enrichment**
**(On behalf of Plaintiffs and the Nationwide Class)**

304. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth

herein and bring this claim individually and on behalf of the proposed Nationwide Class.

305. Unjust enrichment is established where (1) the defendant benefited; (2) at the plaintiff's expense; and (3) equity and good conscience require restitution.

306. Plaintiffs and Nationwide Class Members conferred a benefit on Edward Jones in the form of valuable private information, including personal financial records, that Edward Jones collected from Plaintiffs and Nationwide Class Members. Edward Jones collected, used, and disclosed this information to third parties, including at least Google, Meta, The Trade Desk, LinkedIn, and ClickTale, for its own gain, including for advertising, analytics, and marketing purposes.

307. Edward Jones knew or appreciated the benefits of such information that it intentionally collected and disclosed to third parties, by virtue of its unauthorized disclosure and use of this data and the valuable analytics, insights, and advertisements generated from it, including using this unlawfully disclosed information to identify "lookalikes" that could be converted from potential to actual customers through targeted advertising.

308. Plaintiffs and Nationwide Class Members also conferred a benefit on Edward Jones in the form of commissions, fees, and other benefits for its financial services.

309. Plaintiffs and Nationwide Class Members would not have provided their valuable private and financial information to Edward Jones or paid for Edward Jones's services if they had known Edward Jones was disclosing their private data to third parties and using it for its own gain.

310. Edward Jones unjustly retained these benefits at the expense of Plaintiffs and Nationwide Class Members. Edward Jones did not provide any commensurate compensation to Plaintiffs and Nationwide Class Members in exchange for its disclosure of their private information for its own gain.

311. The benefits that Edward Jones derived from Plaintiffs' and Nationwide Class Members' private and financial information rightfully belong to Plaintiffs and Nationwide Class Members. It would be inequitable under unjust enrichment principles for Edward Jones to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint. It would also be inequitable for Edward Jones to retain the fees Plaintiffs and Nationwide Class Members paid to Edward Jones for its services as Edward Jones obtained them through its unfair and unconscionable trade practices.

312. Edward Jones should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Nationwide Class Members all unlawful or inequitable proceeds that Edward Jones received from them, and such other relief as the Court may deem just and proper. There is no remedy at law that will address this harm as monetary damages will not capture or account for the wrongful profit or benefit that Edward Jones received from exploiting Plaintiffs' and Nationwide Class Members' data.

**RELIEF REQUESTED**

Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court grant the following relief:

(a) Certification of this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Classes;

(b) A declaratory judgment that Edward Jones violated: (1) the Electronic Communications Privacy Act; (2) the California Invasion of Privacy Act; (3) Plaintiffs' and Class Members' privacy rights as provided at common law; and (4) Plaintiffs' and Class Members' rights to restitution under common law;

(c) An order enjoining Edward Jones from engaging in the unlawful practices and illegal acts described herein; and

(d) An order awarding Plaintiffs and the Class: (1) actual or statutory damages; (2) punitive damages—as warranted—in an amount to be determined at trial; (3) nominal damages; (4) restitution; (5) reasonable attorneys' fees and expenses and costs of suit; (6) pre-judgment and post-judgment interest as provided by law; and (7) such other and further relief as the Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the proposed Classes, demand a trial by jury for all the claims asserted in this Complaint so triable.

Dated: June 19, 2026

/s/*Amanda Fiorilla*
Christian Levis (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
Rachel Kesten (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**

44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com

Alec M. Leslie (*pro hac vice*)
**BURSOR & FISHER, P.A.**
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7126
E-Mail: aleslie@bursor.com

Joshua R. Wilner (State Bar No. 353949)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: jwilner@bursor.com

Robert C. Schubert S.B.N. 62684
Willem F. Jonckheer S.B.N. 178748
Amber L. Schubert S.B.N. 278696
Sonum Dixit S.B.N. 353395
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel.: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law
sdixit@sjk.law

*Attorneys for Plaintiffs*